**Nos.** 25-7461, 25-7467, 25-7469, 25-7824, 25-7869

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

GRANT HOUSE, et al.,
*Plaintiffs-Appellees,*

v.

GRACELYN LEE LAUDERMILCH
*Objector-Appellant*

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, et al.,
*Defendants-Appellees*

On Appeal from the United States District Court
for the Northern District of California, Oakland Division
Case No. 4:20-cv-03919-CW
The Honorable Claudia Wilken

## APPELLANT'S OPENING BRIEF

Gracelyn Lee Laudermilch
209 Crawford Lane
Rome, PA 18837
(570) 637-4508
gllaudermilch@gmail.com

*Pro Se Objector-Appellant:* Gracelyn Lee Laudermilch

# TABLE OF CONTENTS

**Page**

Table of Authorities................................................................................iii

Introduction.........................................................................................1

Jurisdictional Statement.......................................................................13

Issues Presented on Appeal..................................................................13

Statement of the Case..........................................................................14

    I.     Procedural History………....................................................14

    II.    Pro Se Objector-Appellant: Gracelyn Laudermilch...........................23

Summary of the Argument....................................................................25

Standard of Review..............................................................................26

Argument............................................................................................29

    I.     Pro Se Appellant Gracelyn Laudermilch Has Standing to Object to and Appeal the Continuation of the Injunctive Relief.......................29

        A.    The District Court Misapplied the Law of Article III Standing, Constituting an Abuse of Discretion.........................................31

        B.    Laudermilch Suffered a Concrete and Particularized Injury Caused by the District Court's Approval of the Settlement and Implementation of the Injunctive Relief..................................33

        C.    The Injunctive Relief's Roster Limits Cause Ongoing and Irreparable Harm to Current and Future Student-Athletes.......34

        D.    The District Court Failed to Redress the Ongoing Harm Caused by the Roster Limits Through a Grandfathering Provision......36

    II.    The District Court Abused Its Discretion by Approving the Settlement and Continuing Injunctive Relief That Are Not Fair, Reasonable, or Adequate..................................................................................39

i

A. The Settlement Creates an Intra-Class Conflict: The Damages Class Seeks Backward-Looking Monetary Relief While the Injunctive Relief Has Forward-Looking Interests……………....40

B. The Injunitive Relief Class Was Not Adequately Represented in Violation of Rule 23(a)(4)……….…………...…………….....42

    1. Class Counsel Failed to Protect the Interests of the Injunctive Relief Class…………....................................43

    2. Class Representatives Failed to Protect the Interests of the Injunctive Relief Class…………………....................47

C. The Settlement and Injunctive Relief Violate Due Process by Failing to Give Adequate Notice to Future Class Members and Denying Them an Opportunity to Opt Out.............................52

    1. Notice Was Constitutionally Inadequate.......................53

    2. The Settlement and Injunctive Relief Improperly Bind Future Class Members With No Ability to Opt Out.......56

    3. Pro Se Objectors Were Excluded from the Amendment Process Redressing Roster Limits.................................58

CONCLUSION.................................................................................................59

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1988 Tr. for Allen Child. v. Banner Life Ins. Co.*,
   28 F.4th 513 (4th Cir. 2022) ................................................................43

*Allen v. Bedolla*,
   787 F.3d 1218 (9th Cir. 2015) .......................................................27, 28

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)................................28, 39, 41, 43, 46, 47, 51, 57

*Becker v. N.D. Univ. Sys.*,
   112 F.4th 592 (8th Cir. 2024) .............................................................34

*Briseño v. Henderson*,
   998 F.3d 1014 (9th Cir. 2021) ............................................................27

*Carter v. Nat'l Collegiate Athletic Ass'n*,
   No. 3:23-cv-06325 (N.D. Cal. Dec. 7, 2023) .....................................15

*Cnty. of Santa Clara v. Trump*,
   250 F. Supp. 3d 497 (N.D. Cal. 2017)................................................33

*Davis v. Astrue*,
   874 F. Supp. 2d 856 (N.D. Cal. 2012)................................................29

*Devlin v. Scardelletti*,
   536 U.S. 1 (2002)....................................................................39, 58, 59

*Geo Grp., Inc. v. Newsom*,
   50 F.4th 745 (9th Cir. 2022) ...............................................................27

*Glasser v. Volkswagen of Am., Inc.*,
   645 F.3d 1084 (9th Cir. 2011) ............................................................31

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ...........................27, 28, 52, 53, 57, 58

*Hansberry v. Lee*,
   311 U.S. 32 (1940)..........................................................39, 43, 55, 56

*House v. Nat'l Collegiate Athletic Ass'n*,
    No. 4:20-cv-03919 (N.D. Cal. June 15, 2020)....................................14

*Hubbard v. Nat'l Collegiate Athletic Ass'n*,
    No. 4:23-cv-01593 (N.D. Cal. Apr. 4, 2023)....................................15

*In re College Athlete NIL Litigation (House)*,
    No. 4:20-cv-03919-CW (N.D. Cal. July 14, 2021) ...........................15

*In re First Cap. Holdings Corp. Fin. Prods. Sec. Litig.*,
    33 F.3d 29 (9th Cir. 1994) .........................................................31, 32

*In re FleetBoston Fin. Corp. Sec. Litig.*,
    253 F.R.D. 315 (D.N.J. 2008)...........................................................49

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 934 (9th Cir. 2015) ..........................................28, 50, 51, 52

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., and Prods. Liab.*
    *Litig.*,
    895 F.3d 597 (9th Cir. 2018) ...........................................42, 46, 47

*Kim v. Allison*,
    87 F.4th 994 (9th Cir. 2023) .........................................................42, 47

*Langer v. Kiser*,
    57 F.4th 1085 (9th Cir. 2023) ..........................................................33

*Low v. Trump Univ., LLC*,
    246 F. Supp. 3d 1295 (S.D. Cal. 2016)..............................................32

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
    339 U.S. 306 (1950)...............................................53, 54, 55, 56, 58

*Nat'l Collegiate Athletic Ass'n v. Alston*,
    594 U.S. 69 (2021)...........................................................................14

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
    802 F.3d 1049 (9th Cir. 2015) .........................................................14

*Officers for Just. v. Civ. Serv. Comm'n of City and Cnty. of S.F.*,
    688 F.2d 615 (9th Cir. 1982) ...........................................................36

iv

*Oliver v. Nat'l Collegiate Athletic Ass'n*,
   No. 4:20-cv-04527 (N.D. Cal. July 8, 2020) ......................................14

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999) ...............................................39, 41, 43, 46, 47, 57

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985) ...............................................54, 55, 56, 57

*United States v. Hinkson*,
   585 F.3d 1247 (9th Cir. 2009) .......................................................27

*Schy v. Susquehanna Corp.*,
   419 F.2d 1112 (7th Cir. 1970) .......................................................49

*S.F. NAACP v. S.F. Unified Sch. Dist.*,
   59 F. Supp. 2d 1021 (N.D. Cal. 1999) ........................................32, 35

*Stanton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) .........................................................42

*Van v. LLR, Inc.*,
   962 F.3d 1160 (9th Cir. 2020) .......................................................33

*Zucker v. Occidental Petroleum Corp.*,
   192 F.3d 1323 (9th Cir. 1999) .......................................................31

**Statutes**

20 U.S.C. § 1291 ..................................................................................13

20 U.S.C. § 1331 ..................................................................................13

20 U.S.C. § 1332 ..................................................................................13

20 U.S.C. § 1337 ..................................................................................13

**Rules**

Fed. R. Civ. P. 23 .............................................................32, 36, 42, 49, 52

**Constitutional Provisions**

U.S. Const. amend. V ...............................................................................52

U.S. Const. amend. XIV ..........................................................................52

**Other Authorities**

Daniel Libit, *Liberty Track Walk-On Stays Course in House v. NCAA Deal Objections*, SPORTICO (Nov. 5, 2025), https://www.sportico.com/leagues/college-sports/2025/gracelyn-laudermilch-liberty-house-v-ncaa-settlement-1234875852/.................................................................................... 24

Deepak Joshi, *Miller Moss' Confirmed Louisville NIL Turns QB Lincoln Riley Break-Up on Its Head*, ESSENTIALLY SPORTS (Aug. 8, 2025), https://www.essentiallysports.com/ncaa-college-football-news-miller-moss-confirmed-louisville-nil-turns-qbs-lincoln-riley-break-up-on-its-head/................................................................................... 50

Rocco Gasparro *Cards Showcase Their Abilities at Pro Day*, GOCARDS (Mar. 24, 2026), https://gocards.com/news/2026/3/24/football-jeff-brohm-on-2026-pro-day.................................................................... 22

The Running Effect, *The Death of the NCAA as We Know It: How Roster Limits Will Kill Collegiate Sports*, The Running Effect Podcast (Jan. 20, 2025), https://creators.spotify.com/pod/profile/dominic-schlueter/episodes/The-Death-Of-The-NCAA-As-We-Know-It-How-Roster-Limits-Will-Kill-Collegiate-Sports-With-Coach-Mark-Fairley-e2thh7q........................................................................... 16, 55

SPORTSWISE, *Ep. 89: The Final House v. NCAA Podcast (For Now) With...Grant House!*, at 15:48 (July 2, 2025), https://www.sportswisepod.com/ep-89-the-final-house-vs-ncaa-podcast-for-now-withgrant-house/.................................................... 48

vii

## <u>REQUEST FOR ORAL ARGUMENT</u>

Appellant Gracelyn Lee Laudermilch respectfully requests oral argument.

## INTRODUCTION

My name is Gracelyn Lee Laudermilch ("Laudermilch"), and I am a pro se appellant in *House v. NCAA*. I objected to the Injunctive Relief and now appeal its continuation because the District Court's approval of the Settlement and immediate implementation of that relief caused harm to me and thousands of other student-athletes. 2-LaudermilchER-301, 304–05, 429; 3-LaudermilchER-615. Over the last two years, I have watched my teammates, peer athletes, and friends confront consequences imposed on us without adequate representation or meaningful due process. The Settlement's Injunctive Relief—particularly its roster limits—is already reshaping the opportunities and futures of thousands of current and future student-athletes. Because the Injunctive Relief imposes real and ongoing harm, it is imperative that the voices of student-athletes—not just attorneys—are meaningfully represented and heard in this process. *See e.g.,* 1-LaudermilchER-175–81.

My dream to compete in Division I athletics began in 2019, when I started running and fell in love with the sport. I devoted 20 hours per week to training while maintaining a 4.0 GPA and taking dual-enrollment college classes. Running became my most demanding teacher. Nothing about this dream has come easily—I have faced injuries and setbacks that tested my mental and physical health. But through these challenges, my dream was fueled by success: I am a five-time state

1

medalist, an All-American, and hold numerous high school records. Running has shaped who I am today and instilled a discipline that I could never have learned in a classroom.

In the eighth grade, I was not fast. I was only a 14-year-old girl with a dream to compete in Division I athletics. By my senior year of high school, I was actively speaking with five National Collegiate Athletic Association (NCAA) Division I programs: Temple University, the United States Military Academy at West Point, Northeastern University, Binghamton University, and Liberty University (Liberty), as well as one National Association of Intercollegiate Athletics (NAIA) school, Indiana Wesleyan. Even though I went through the recruitment process with multiple universities, my dream school was Liberty. Liberty's mission of "Training Champions for Christ" aligned with my values and was exactly what I envisioned for my collegiate running future.

I followed Liberty online through social media and running apps, traveled to watch them compete, and eventually met the women's head coach. In the fall of my senior year of high school, I was invited on an official recruitment visit to Liberty—the school and team were everything I hoped for and more. The girls were kind, the coaches cared, faith was the center of the program, and the culture was unmatched. I also loved the large team of women who shared my passion for running and life. During the visit, the women's head coach provided a document to

2

me with my name on it next to the Liberty athletics logo, detailing scholarship packages and race standards. When my parents asked about the length of the team's commitment to me, the coach assured us that Liberty is committed to developing its student-athletes for four years, regardless of injury or performance.

I went on two other official college visits (Binghamton and Indiana Wesleyan) and carefully made my decision. My exploding offer deadline for Binghamton arrived, and I politely declined it. On October 31, 2024, at 4:00 pm, I called Liberty to commit. However, during the call, the coach explained that a few hours earlier, she had been informed that Liberty was opting into the Settlement, and she was unsure how many roster spots would be allotted for athletes. At that moment, there were 32 women on the cross-country roster. The coach assured me that she did not want to cut her girls or rescind roster spots for recruits, but this was how the Settlement had to be implemented.

I hung up the phone and cried. I cried for the years I had trained, the injuries I had pushed through, the dream I had worked toward, and the future that was suddenly being ripped away from me. The Settlement and its Injunctive Relief completely disrupted the path I had worked so hard to build, halting everything when my roster spot was rescinded. I was only one of thousands of student-athletes left in limbo, trying not to let the uncertainty derail our daily lives. Our futures had been placed in the hands of a single federal judge in California, and we did not

even know it. Despite having an NCAA ID and being actively recruited, I never received notice of the Settlement. 2-LaudermilchER-303. I learned about it only because of its real-time impact on my life and running career.

After that phone call, I made the decision to keep training and working as hard as ever in hopes of earning a spot on the team, but the pressure was immense. Racing morphed into a source of stress with higher stakes. Liberty's scholarship and walk-on standards became more stringent. On a run on January 20, 2025, I listened to a running podcast, which was the first resource that explained the Settlement to me. After listening, I wrote a letter to the district court—because the podcast encouraged it—objecting to the roster limits and negative impact on women in violation of Title IX. The girls at my lunch table read the letter, and my literature teacher proofread it. On January 31, 2025, I wrote my letter to the District Court for the Northern District of California. 3-LaudermilchER-615–17. On February 1, 2025, I emailed my letter to Mr. Jeffrey Kessler. I did not understand who these attorneys were, but I wanted to make sure they were aware of what was happening to future student-athletes. 2-LaudermilchER-308.

After sending those emails, I continued living life in limbo. One by one, my friends committed to universities, finalized their fall schedules, found their roommates, and planned their dorm rooms—while my own path remained uncertain. My high school guidance office repeatedly emailed me asking where I

was going to college. They were posting social media profiles of the top students in my class and wanted me to submit my information and decision. I had no idea what to tell them, so I kept ignoring their emails. It was really discouraging to watch others celebrate while I was left hoping for a chance to run at Liberty.

The rest of my indoor season was rough. I wanted to run fast, but I was putting too much pressure on myself, and racing became a source of anxiety and stress. On March 17, 2025, I checked my email before heading out for a run and noticed a suspicious email from "CW CRD." I had no idea who that was. The email asked whether I planned to attend the Final Approval Hearing in person or via Zoom. I had no idea that I had been summoned. Apparently, the district court summons had been filed two weeks earlier, on March 4, but I had no one helping me follow the case or keep track of the docket. The summons was attached to the email, and I saw the list of numerous objectors represented by lawyers, an NFL player (Benjamin Burr-Kirven), a celebrity LSU gymnast (Olivia Dunne), and me. 3-LaudermilchER-562–64. My name seemed so out of place on that list—no attorney, no accolades, no experience. Just a story shared in a letter. I was shocked to my core that I had been chosen to speak. I felt like I knew so little about the case. I incorrectly thought that "House" stood for the House of Representatives, not Grant House, a swimmer from Arizona State University.

5

As I processed the court order, my run became therapeutic. I was thankful for the opportunity and the incredible responsibility to be chosen to represent the Injunctive Relief Class, especially the high school seniors and younger athletes who would be impacted by this decision over the next ten years. I thought Judge Wilken was trying to take the Settlement's impact on real people into account.

This email started a cascade of my parents and me reaching out to people who knew more about the case than we did. I had never been in a courtroom before or even watched a hearing. I only knew what I learned from my ninth-grade civics class. I did not know what to wear or how to address the judge. I thought it would be more powerful to appear in person rather than speak over Zoom, so I flew to California with my parents and four younger siblings. Because of the cross-country trip, I missed school, practices, and a track meet, which made my high school coaches upset with me.

On April 7, 2025, I stood in front of a judge who would decide the future of my career and the careers of thousands of other student-athletes. I told my story and prayed she would see the harm and rectify it. 3-LaudermilchER-473–77. As I shakily returned to my seat, I received applause from those gathered in the courtroom.

I learned a lot in the courtroom that day. I learned about Rule 23 and adequate representation. I learned that Class Counsel (Mr. Kessler and Mr.

Berman) were actually supposed to be representing the entire class, including me, despite their earlier email communication indicating that they did not represent objectors. 2-LaudermilchER-308; 3-Laudermilch-436. I learned from a conversation with Sedona Prince, a named Plaintiff, that she disagreed with roster limits and did not want them to be a part of the Settlement. 2-LaudermilchER-306. I also learned that you do not need to be a legal expert to recognize that this Settlement was unfair, but that it took a legal expert to conceal its unfairness and the fact that it primarily compensated male student-athletes while ignoring Title IX. And I heard stories from other student-athletes who, like me, were already losing opportunities to compete on Division I teams because of the Settlement. *See e.g.*, 3-LaudermilchER-467–73, 478–89).

As a result of the hearing, Judge Wilken asked that "grandfathering" be considered to address roster-limit concerns. 3-LaudermilchER-462–63, 524–25, 540. Class Counsel and Defense Counsel were given one week to revise the Settlement, while the objectors had one day to submit a one-page response to a 221-page document. 3-LaudermilchER-539–40. On April 15, 2025, I skipped school to respond to the proposed changes, which meant I could not run in my track meet that day. *See* 2-LaudermilchER-429. This caused further issues with my high school coaches and added to my stress. I can understand why more class members did not object—this was an extremely difficult process for any objector,

7

let alone a pro se objector navigating it without an attorney while trying to be a full-time high school student-athlete.

I continued forward, hoping that the Settlement would be denied—competing at track state championships, earning awards and academic scholarships, planning my graduation party, and preparing my graduation speech as one of the top three students in my class. I did all of this without knowing where I would attend college. It was devastating, to put it lightly. On May 31, 2025, I walked across the stage at graduation, and they said, "Gracelyn Laudermilch will be pursuing a major in biopsychology and a collegiate running career." They mentioned specific career plans and schools for all my peers, but I did not yet have a school. In my graduation address, I spoke directly from the heart about finding peace in uncertainty. I encouraged my classmates to ground themselves in faith as we stepped into so much change.

On June 5, 2025, a week after graduation, I received a text from the Liberty coaches asking to talk the next day. I was bracing for more bad news. I did not have access to the case docket, so I was checking X daily for any social media updates. On June 6, 2025, during the call, I learned that I would have a spot on the Liberty women's cross-country team that fall. I was so happy. But only a few hours later, I learned the Settlement had been approved, including the roster-cap provision. 1-LaudermilchER-111, 175–82, 202. The timing made the implications

unmistakable: my roster spot was offered the same day the Settlement was approved, and it existed only because another athlete was displaced from the team due to roster limits. I would be taking the place of one of the women who had made me feel so welcomed on my recruiting visit. I had a spot, while many other student-athletes—both incoming freshmen and those already on teams—did not. Ironically, the women who lost their roster spots have offered me unconditional support, serving as a source of strength throughout this process. The sense of survivor's guilt was overwhelming and broke my heart. I hoped Judge Wilken's approval of the Designated Student Athletes (DSA) in the revised Settlement agreement would resolve the harms caused by roster limits. 1-LaudermilchER-176–77. It did not. 2-LaudermilchER-245, 272, 275, 277, 291, 306–07.

On July 30, 2025, we had a team meeting where the coach told us there would be a limited number of roster spots on the women's cross-country team. When I arrived at Liberty in the fall, there was a time trial, where five girls competed for two spots. Because I had already been promised a roster spot, I did not have to compete against my teammates for a place on the team. But I witnessed firsthand the consequences for my teammates—consequences that, for some, were overwhelming. Despite earning a spot on the team, they withdrew due to the emotional turmoil. 2-LaudermilchER-304–05.

9

Respectfully, the attorneys who negotiated this agreement (Mr. Kessler, Mr. Berman, and Mr. Kilaru) have not witnessed the harm my teammates and I have experienced because of this Settlement. They have not been there to counsel student-athletes who now have to rework their schedules, meal plans, friend groups, housing, educational institutions (which determine their majors), and their lives to accommodate the fact that they no longer are part of a Division I team. The carnage from the roster cuts is everywhere. Not only did it affect my friends, but the pressure of having to prove myself did not help my performance during the fall season, and my confidence took a beating.

While my roster spot was guaranteed for freshman year, the roster limits imposed by the Injunctive Relief eliminated any assurance that I would have the opportunity to develop as a student-athlete over the course of my four-year collegiate career. 1-LaudermilchER-44–45. The roster spot I was offered as a freshman provides no assurance of continued participation. Instead, I am left with the constant fear that an injury, sickness, stress, or a family emergency could impair my performance and jeopardize my place on the team.

At the final approval hearing on April 7, 2025, I learned that incoming student-athletes would have the opportunity to object to the Injunctive Relief. 3-LaudermilchER-438. I was searching for that notice as I completed all the incoming student-athlete paperwork, and finally, I received an email on July 23,

10

2025, from the NCAA Eligibility Center. 2-LaudermilchER-303. The wording of the notice painted a rosy picture of the Settlement. The document made it sound like Class Counsel represented all the student-athletes, including objectors. 2-LaudermilchER-312–14. Reading the notice made clear how misleading the process was, and it is the reason I submitted my third objection letter.

On September 12, 2025, I submitted my third objection letter—this time addressing the continuation of the Injunctive Relief—a little more educated on the case with first-hand experience as a student-athlete facing the uncertainty of roster cuts. 2-LaudermilchER-301–08. Based on my letter, the district court summoned me a second time to present my concerns about the Injunctive Relief. 2-LaudermilchER-270. This time, the hearing was held on Zoom, so my family and I did not need to travel to California.

On November 6, 2025, I logged into the hearing on my laptop computer from a college study room in the athletic center, with my parents gathered off camera for support. My teammates and younger siblings waited eagerly outside in the hallway, watching the hearing on Zoom. In the middle of my presentation to Judge Wilken, my internet connection became unstable—when you are competing with hundreds of other college students for Wi-Fi access, it is not always reliable. 2-LaudermilchER-216. After objecting via Zoom, I immediately traveled to a track meet with the teammates who had supported me through this process.

11

Balancing academics, athletics, and objecting to this Settlement is overwhelming, to say the least. I was discouraged and exhausted after presenting to Judge Wilken. Writing and preparing for the hearings took tremendous time and energy. It was, and remains, impractical for a student-athlete to serve as a pro se objector-appellant, but I am committed to seeing this through because the Settlement will impact the lives of countless student-athletes over the next decade.

As a result of the Settlement and its Injunctive Relief, I live every day with a smaller, more insecure, and unstable team at college. The peace of knowing I will be a student-athlete for four years is gone. I am clearly just a numerical transaction to the NCAA, not a living, breathing, 19-year-old with goals and aspirations. Division I student-athletes, without adequate notice or representation, have been forced to deal with the volatility of this Settlement. I decided to file this appeal to the Ninth Circuit, not because I have the energy or legal expertise, but because student-athletes deserve and need to be heard.

Several experts in college athletics asked me whether I had considered finding a pro bono attorney. While that would make this process a lot easier, it would eliminate my opportunity to speak on behalf of the Injunctive Relief Class and silence the voice I was chosen to represent at the previous fairness hearings. When the courtroom applauded after my April 7 statement, it was clear that people recognized the Settlement as unfairly harming student-athletes. The voice of the

12

student-athlete must be heard and considered. Therefore, I submit this brief in an effort to see justice restored.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1332(d), and 1337. This Court has jurisdiction under 28 U.S.C. § 1291.

On June 6, 2025, the district court granted final judgment approving the class action Settlement. 1-LaudermilchER-110–16, 202. On November 13, 2025, the district court entered a final order overruling objections to the continuation of the Injunctive Relief Settlement. 1-LaudermilchER-11. Objector-Appellant Laudermilch filed a timely notice of appeal on December 11, 2025, in accordance with Federal Rule of Appellate Procedure 4(a). 5-LaudermilchER-822–24.

## ISSUES PRESENTED ON APPEAL

1. Whether the district court abused its discretion by implementing and continuing Injunctive Relief that imposes roster limits and inflicts irreparable harm on current and future student-athletes.

2. Whether the district court abused its discretion by finding adequate representation where Class Counsel and Class Representatives failed to protect the interests of the Injunctive Relief Class.

13

3. Whether the district court violated due process by approving Injunctive Relief that binds absent and future class members who were not adequately represented and had no meaningful opportunity to object.

## STATEMENT OF THE CASE

### I.    Procedural History

In the last two decades, Division I student-athletes have brought antitrust lawsuits against the National Collegiate Athletic Association (NCAA) and athletic conferences, challenging the rules that prohibited student-athletes from monetizing their name, image, and likeness (NIL) and athletic services. *See generally O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049 (9th Cir. 2015); *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021). In 2020, a group of student-athletes led by Plaintiff-Appellee Grant House, a Division I swimmer from the University of Arizona, filed a lawsuit against the NCAA and the Power Five athletic conferences: Atlantic Coast Conference (ACC), Big Ten, Big 12, Pac-12, and Southeastern Conference (SEC) (collectively Defendants-Appellees). *See House v. Nat'l Collegiate Athletic Ass'n*, No. 4:20-cv-03919 (N.D. Cal. June 15, 2020). Later that year, Tymir Oliver, a Division I football player from the University of Illinois, filed a separate antitrust action challenging the NCAA's compensation restrictions. *See Oliver v. Nat'l Collegiate Athletic Ass'n*, No. 4:20-cv-04527 (N.D. Cal. July 8, 2020). That case was consolidated with *House v.*

14

*NCAA*, forming *In re College Athlete NIL Litigation (House)*, No. 4:20-cv-03919-CW (N.D. Cal. July 14, 2021).

On April 4, 2023, student-athletes filed *Hubbard v. NCAA*, No. 4:23-cv-01593 (N.D. Cal. Apr. 4, 2023), seeking damages for benefits they should have received prior to the Supreme Court's decision in *Alston.* On December 7, 2023, another group of Division I student-athletes filed a new suit challenging the NCAA's rules prohibiting payments for athletic services. *See Carter v. Nat'l Collegiate Athletic Ass'n*, No. 3:23-cv-06325 (N.D. Cal. Dec. 7, 2023).

These antitrust lawsuits were consolidated into a single structure, creating one Settlement covering multiple subclasses: three past Settlement Damages Classes: (1) Football and Men's Basketball, (2) Women's Basketball, and (3) Additional Sports (all other Division I sports), and one future Injunctive Relief Class. 1-LaudermilchER-133–35. In May 2024, the parties announced a proposed Settlement covering all four classes of Division I student-athletes who competed after June 15, 2016. 4-LaudermilchER-747, 781–82. The Settlement included a consolidated complaint for the claims in *House* and *Carter*, and added challenges to NCAA rules imposing scholarship limits. 4-LaudermilchER-739, 745–53.

On July 26, 2024, Plaintiffs moved for Settlement approval. 4-LaudermilchER-739. On September 5, 2024, the district court conducted a preliminary approval hearing for objectors to present arguments. 4-

15

LaudermilchER-734–37. Laudermilch was not aware of the hearing or the opportunity to object and therefore did not participate. On October 7, 2024, the court granted preliminary approval of the revised Settlement and set a January 31, 2025, deadline for class members to file claims, objections, or opt out of the Settlement. 3-LaudermilchER-702–03, 707. There was no ability to opt out of the Injunctive Relief. 2-LaudermilchER-366–67, 391–92. Laudermilch, a recruited Division I student-athlete with an NCAA ID, did not receive notice of the January 31, 2025, objection deadline. She learned about the case and the opportunity to object from a January 20, 2025, Running Effect Podcast, "*The Death of the NCAA as We Know It: How Roster Limits Will Kill Collegiate Sports*."

On January 31, 2025, Laudermilch wrote an objection letter to the district court challenging the Settlement and Injunctive Relief based on roster limits and the negative impact on women's sports by disregarding Title IX of the Education Amendments Act (Title IX). 3-LaudermilchER-615–17. On February 1, 2025, Laudermilch emailed her objection letter to Class Counsel (Jeffrey Kessler). 2-LaudermilchER-301–08. Later that day, she received an email back from Class Counsel at Winston & Strawn (Partner Adam Dale) stating, "We are the lawyers representing the athletes who are asking the judge to approve the settlement." 2-LaudermilchER-308.

16

On March 4, 2025, Laudermilch was summoned to appear before the Northern District Court of California. 3-LaudermilchER-563. She did not learn of this summons until March 17, 2025, when she received an email from "CW CRD" asking if she would appear in person or via Zoom for the Fairness Hearing on April 7, 2025. Laudermilch, who was only seventeen, traveled with her parents and four younger siblings from Pennsylvania to California to appear in person at the Final Approval Hearing the following month.

On April 7, 2025, the district court conducted a six-hour final approval hearing with Class Counsel, Defense Counsel, and both represented and pro se objectors. 3-LaudermilchER-436, 543. Laudermilch appeared in person, representing herself pro se, and requested that the district court not approve the Settlement because it was "unfair." 3-LaudermilchER-473. She specifically warned that roster limits would harm thousands of student-athletes and that the inequitable payments to female athletes reinforced the myth that women are not worth as much as men. 3-LaudermilchER-473–77. Other objectors also raised concerns about roster limits and Title IX at the fairness hearing and in written objections to the court. 3-LaudermilchER-439–73, 483–89, 494–99, 626–29. Because these objectors warned that future class members would be bound by a release of claims that had not yet occurred, the district court asked Class Counsel

17

and Defense Counsel to discuss with their clients and the objectors to find a solution. 3-LaudermilchER-537–38.

On April 14, 2025, the parties filed a Joint Supplemental Brief for Final Approval and a Third Amended Stipulation and Settlement Agreement. 3-LaudermilchER-544–60. The amended Settlement addressed the district court's concerns that future Division I athletes could not release their Injunctive Relief claims until they received notice and an opportunity to object to the continuation of the Settlement. 2-LaudermilchER-400–04. Objectors were given one day to review the 221-page filing and prepare a one-page response. 3-LaudermilchER-539–40. Laudermilch skipped school on April 15, 2025, to review the revised agreement and prepare her response, which she filed on time. 2-LaudermilchER-429.

On April 18, 2025, the parties submitted a revised Third Amended Settlement Agreement Errata with a redlined version attached. The revised Settlement divided the Injunctive Relief Settlement Class into two groups: (1) Current Injunctive Relief Settlement Class Members, and (2) Incoming Injunctive Relief Settlement Class Members, defined as athletes who would "compete for the first time on a Division I athletic team after Final Approval." 2-LaudermilchER-420–23. Under this revised definition, Laudermilch would be an Incoming Injunctive Relief Class Member if she was on the roster of a Division I team in the

18

fall and therefore should have received notice and an opportunity to object to the Injunctive Relief. 2-LaudermilchER-424–25.

On April 18, 2025, the district court reset deadlines and permitted additional objectors to reply to the Amended Settlement by April 22, 2025. 5-LaudermilchER-960. From April 21–22, 2025, the district court received over a hundred objection letters detailing the irreparable harm caused by the Settlement and Injunctive Relief. *See e.g.*, 2-LaudermilchER-405–16. On April 23, 2025, the district court issued an order on the motion for final approval and found that the immediate implementation of the roster limits had resulted in, or would cause, harm to a "significant number" of Injunctive Relief Class members. 2-LaudermilchER-400–01. The district court concluded that because the Settlement was not "fair and reasonable to a significant number of class members whose roster spots will be or have been taken away because of the immediate implementation of the settlement agreement," it could not approve the Settlement in its current form. 2-LaudermilchER-402.

Accordingly, the district court delayed final approval to allow the parties to attempt to modify the Settlement so that Injunctive Relief Class Members would not be harmed by the immediate implementation of the roster limit provisions. 2-LaudermilchER-403. The district court ordered parties to consult with mediator Professor Eric Green, and directed attorneys Laura Reathaford, Steven Molo, and

19

the Buchalter firm—counsel who had already appeared on behalf of objectors challenging roster limits—to be included in the discussions. 2-LaudermilchER-404. Pro se objectors, Gracelyn Laudermilch and Gannon Flynn, who also appeared in person at the April 7, 2025, fairness hearing, were not included in these discussions. 2-LaudermilchER-404.

On May 7, 2025, the parties filed a revised Settlement agreement. 2-LaudermilchER-348–58. In their supplemental submission supporting final approval, Class Counsel stated that they secured the roster-limit exceptions the district court requested. 2-LaudermilchER-349–52. The amended settlement agreement introduced a Designated Student-Athlete (DSA) designation to address concerns about roster limits. At the discretion of a university, DSA status could be granted to any current or incoming student-athlete who might otherwise be removed from a roster due to the immediate implementation of roster limits. 2-LaudermilchER-349–52.

On June 6, 2025, the district court granted the Plaintiffs' Motion for the Final Approval of the Settlement Agreement with Defendants-Appellees: NCAA, ACC, Big Ten, Big 12, Pac-12, and SEC. 1-LaudermilchER-12–202. The district court issued its Order of Final Approval and the Final Judgment and Dismissal with Prejudice, approving the $2.6 billion class action Settlement. Under the terms of the Settlement, the Injunctive Relief went into effect immediately, including the

imposition of roster caps at universities that opted into the Settlement. 1-LaudermilchER-12–109; 2-LaudermilchER-234.

By July 7, 2025, six objector groups had filed separate Notices of Appeal to the Ninth Circuit challenging the district court's approval of the Settlement Agreement and Injunctive Relief. 2-LaudermilchER-330–44. The Ninth Circuit assigned Case Nos. 25-3722, 25-3835, 25-4137, 25-4150, 25-4190, and 25-4218. Laudermilch did not appeal because, as a pro se objector, she was not aware she could. Opening, answering, and reply briefs have been filed in these consolidated appeals, which remain pending before the Ninth Circuit.

On July 23, 2025, Laudermilch received notice directed to Incoming Injunctive Relief Class members—those who would join a Division I team for the first time in the 2025-26 academic year—informing them that the deadline to file objections was September 22, 2025. 2-LaudermilchER-310. On September 12, 2025, Laudermilch, then a freshman at Liberty and a member of the Division I Cross-Country team with DSA status, submitted a timely objection letter to the district court raising concerns about the adequacy of representation and the roster-limit provision that was causing harm to current and future student-athletes cut from teams. 2-LaudermilchER-301–08. Six other student-athletes objected to the continuation of the Injunctive Relief. 2-LaudermilchER-240–69, 272–300. On October 16, 2025, Laudermilch received a second summons directing her to appear

21

via Zoom for the fairness hearing scheduled for November 6, 2025. 2-LaudermilchER-270–71.

On October 31, 2025, Class Counsel moved to add Miller Moss, a high-profile Division I football quarterback who played at the University of Southern California (USC) before transferring to the University of Louisville in December 2024 for a fifth year of eligibility, as a Class Representative. 2-LaudermilchER-238–39. On November 5, 2025, the district court granted the motion and added Mr. Moss as a Class Representative. 2-LaudermilchER-236–37. Mr. Moss is currently being evaluated as a 2026 NFL Draft prospect and participated in Louisville's Pro Day on March 24, 2026. *See* Rocco Gasparro *Cards Showcase Their Abilities at Pro Day*, GOCARDS (Mar. 24, 2026), https://gocards.com/news/2026/3/24/football-jeff-brohm-on-2026-pro-day.

On November 6, 2025, Laudermilch appeared pro se remotely via Zoom for the fairness hearing and objected to the continuation of the Injunctive Relief, citing roster-limit concerns, the harm experienced by DSA student-athletes who no longer had a Division I team on which to compete as a result of the roster limit provisions, and inadequacy of representation with respect to Class Counsel and Class Representatives. 2-LaudermilchER-216–20, 230–32.

On November 13, 2025, the district court overruled objections to the continuation of the Injunctive Relief Settlement. 1-LaudermilchER-2–11. In its

22

decision, the district court asserted that Laudermilch did not have standing to object to the roster limit provisions because she is currently on a roster and that there were no issues of adequacy of representation. 1-LaudermilchER-8.

On December 11, 2025, Laudermilch filed a timely Notice of Appeal with the Ninth Circuit, which was assigned Case No. 25-7824. 5-LaudermilchER-822–24. All six other parties who objected to the continuation of the Injunctive Relief also filed Notices of Appeal. 5-LaudermilchER-790–824. On February 4, 2026, the motion to consolidate the cases before the Ninth Circuit was granted for: 25-7461, 25-7467, 25-7469, 25-7824, 25-7869. (Dkt. No. 14).

## II.  Pro Se Objector-Appellant: Gracelyn Laudermilch

Objector-Appellant **Gracelyn Laudermilch** graduated from Northeast Bradford High School in Rome, Pennsylvania, in 2025. She is a current Division I student-athlete at Liberty University and a member of the Women's Cross Country and Track and Field Team. She competes as a walk-on without an athletic scholarship. As a freshman on the roster of a Division I team, Laudermilch is a member of the Settlement's Incoming Injunctive Relief Class. 2-LaudermilchER-366–67.

| |
|---|
| **Gracelyn Laudermilch**<br>Liberty University – Cross County (2025-Present)<br>Northeast Bradford High School – (Class of 2025) |



September 12, 2025

Re: College Athlete NIL Litigation, Case No. 4:20-cv-03919 CW

Dear Judge Wilken,

I am thankful to write to you from Liberty University wh[...] student athlete (DSA) on the cross country and track team[...] concerned that there are major contradictions that exist in [...] mandated policies and how th[...] student athletes across the na[...]

Daniel Libit, *Liberty Track Walk-On Stays Course in House v. NCAA Deal Objections*, SPORTICO (Nov. 5, 2025), https://www.sportico.com/leagues/college-sports/2025/gracelyn-laudermilch-liberty-house-v-ncaa-settlement-1234875852/.

Laudermilch is now a 19-year-old Division I walk-on distance runner whose opportunity to participate in college sports was harmed by the Settlement's roster-limits provision of the Injunctive Relief. As a high school senior, she flew from rural Pennsylvania to Oakland, California, to object in person—appearing pro se before Judge Wilken. Her testimony on April 7, 2025, prompted the district court to delay approval and request that the parties amend the Settlement to address roster-limit concerns. *See* 3-LaudermilchER-473–77, 538.

After matriculating at Liberty on August 13, 2025, Laudermilch witnessed the Settlement's harm firsthand: her team roster was reduced from an initial 32 athletes to 24, and then just 17, with cuts determined by a time trial two weeks into practice. On September 12, 2025, she objected to the continuation of the Injunctive Relief and returned to court on November 6, 2025, as the sole unrepresented objector to appear at the second fairness hearing. 2-LaudermilchER-216–20, 230–32, 301. To date, Laudermilch has received no athletic scholarship or any compensation for her NIL rights. She simply seeks the opportunity to participate in Division I college sports and develop as a student-athlete over the next four years without fearing that her roster spot or team will be cut because of the Settlement.

## SUMMARY OF THE ARGUMENT

The district court abused its discretion in approving the Settlement and continuing the Injunctive Relief because the agreement is not fair, reasonable, or adequate under Rule 23 and violates due process.

1. Roster Limits: The Injunctive Relief's roster-limit provisions are causing immediate and irreparable harm to thousands of current and future student-athletes. 2-LaudermilchER-382–83.

2. Standing: The district court misapplied Article III by concluding that Laudermilch lacked standing despite her concrete, individualized injury and the imminent risk of future harm. 1-LaudermilchER-5–8.

25

3. <u>Inadequate Representation:</u> Class Counsel and Class Representatives failed to adequately represent the Injunctive Relief Class.

4. <u>Due Process:</u> Future student-athletes received no notice of the Settlement and no opportunity to opt out. The Injunctive Relief violates due process by binding future class members to broad releases without any meaningful opportunity to protect their interests. 2-LaudermilchER-310, 369–74.

5. <u>Title IX</u>: The Settlement and Injunctive Relief disproportionately harm female student-athletes. By ignoring Title IX concerns, the district court undermined federal civil rights laws and Rule 23's fairness requirements. 2-LaudermilchER-368–74.

Because the district court applied incorrect legal standards, disregarded undisputed evidence of harm, and approved a Settlement that is neither fair nor adequate for the Injunctive Relief Class, the approval order should be vacated, and the case remanded.

## STANDARD OF REVIEW

Approval of a class action settlement is reviewed for **abuse of discretion**, and reversal is warranted where a district court:

(1) Applies the incorrect legal standard;

(2) Relies on clearly erroneous factual findings; or

26

(3) Misapplies the governing law to the facts before it.

*See Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 753 (9th Cir. 2022); *United States v. Hinkson*, 585 F.3d 1247, 1251 (9th Cir. 2009).

Under Federal Rule of Civil Procedure 23(e), a district court bears an independent, non-delegable duty to protect absent class members. The court must apply **heightened scrutiny** to ensure that the settlement is "fair, reasonable, and adequate," particularly where the settlement structure imposes differential burdens on subgroups of the class or where injunctive relief affects future class members. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998); *Briseño v. Henderson*, 998 F.3d 1014, 1022, 1025 (9th Cir. 2021) (holding that Rule 23(e)(2)(C) requires rigorous review of post-class certification and the distribution of burdens and benefits among class members).

This heightened scrutiny is especially critical where the district court is presented with objections raising structural conflicts, notice defects, or foreseeable harm to unnamed class members. The Ninth Circuit has repeatedly held that a district court abuses its discretion when it fails to adequately evaluate objections or fails to meaningfully analyze whether counsel has protected the interests of the entire class. *See Allen v. Bedolla*, 787 F.3d 1218, 1223–24 (9th Cir. 2015) (internal citations omitted) (reversing settlement approval where the district court failed to

27

probe the adequacy of representation and the fairness of negotiated terms affecting absent class members).

Rule 23(e) further requires courts to ensure that injunctive provisions do not impose burdens on absent or future class members who had no realistic opportunity to receive notice of the settlement or object. *See Hanlon*, 150 F.3d at 1024 ("Adequate notice is critical to court approval of a class settlement under Rule 23(e)."); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 945–46 (9th Cir. 2015). This obligation derives not only from Rule 23 but also from the Due Process Clause, which prohibits binding individuals to a settlement without adequate representation, meaningful notice, and a genuine opportunity to be heard. *In re Online DVD*, 779 F.3d at 946.

Where, as here, Injunctive Relief operates prospectively for up to a decade, materially alters participation opportunities, and burdens individuals who were never notified or represented, a district court must engage in the rigorous review mandated by Rule 23(e). Failure to do so constitutes an abuse of discretion. *See Amchem Prods. v. Windsor*, 521 U.S. 591, 627 (1997) (explaining how structural deficiencies that fail to protect absent class members violate Rule 23(e)); *Allen*, 787 F.3d at 1222.

28

## ARGUMENT

**I. Pro Se Appellant Gracelyn Laudermilch Has Standing to Object to and Appeal the Continuation of the Injunctive Relief**

On January 31, 2025, Laudermilch wrote her first objection letter to the district court "on behalf of the thousands of senior student-athletes unable to make a decision on their college sports career due to the roster limits and constant evolution of the NCAA v. House Settlement." 3-LaudermilchER-615.

Contrary to the district court's conclusion that she lacked standing to object to the roster limits provisions, Laudermilch suffered a concrete and particularized injury directly traceable to the Injunctive Relief. 1-LaudermilchER-8; 2-LaudermilchER-307–08, 429; 3-LaudermilchER-615–17. Between October and June 2025, she lost a promised roster spot at Liberty after the university opted into the Settlement. 3-LaudermilchER-475, 615. Although the roster spot was later restored, the disruption was significant: she had already declined other Division I scholarship offers, and the resulting uncertainty materially affected her academic, athletic, and personal planning. 3-LaudermilchER-474–75. Her life was effectively put on hold during a critical transition from high school to college, and the emotional and mental toll of months of instability is itself a cognizable injury. *See Davis v. Astrue*, 874 F. Supp. 2d 856, 863 (N.D. Cal. 2012) (explaining that many courts recognize emotional distress as injury-in-fact).

29

The district court's approval of the Settlement and the implementation of the Injunctive Relief caused what Laudermilch described as "significant disruption." 2-LaudermilchER-429. She explained this disruption meant "the tears, anxiety, stress, and fear as rescinded roster spots and impending and present roster cuts hang over the head of high school and college student-athletes like me and my friends." 2-LaudermilchER-429. She further informed the district court that this harm extended far beyond her own experience: "I am only one of thousands of student athletes left in limbo, trying not to let the uncertainty of our futures derail or hinder our everyday lives." 2-LaudermilchER-306.

Laudermilch and other current and future student-athletes face an ongoing and imminent injury. As a member of the Incoming Injunctive Relief Class, she remains at risk of losing her roster spot under the Settlement's roster limits provisions. *See* 1-LaudermilchER-44–45. The Settlement provides no mechanism for her, or any future student-athlete, to object if that harm occurs in the future. *See* 1-Laudermilch-142–44. The NCAA's assertion that roster spots were never guaranteed ignores the pre-Settlement reality: coaches routinely committed to developing student-athletes over their four-year collegiate careers. 2-LaudermilchER-429. That basic expectation of continuity is central to the student-athlete experience, and the Settlement has eliminated it.

30

**A.     The District Court Misapplied the Law of Article III Standing, Constituting an Abuse of Discretion**

The district court abused its discretion by holding that Laudermilch lacked standing to object to the Injunctive Relief Settlement ("IRS"). In doing so, the district court misapplied the holding of *In re First Cap. Holdings Corp. Fin. Prods. Sec. Litig.*, 33 F.3d 29 (9th Cir. 1994) (hereinafter *First Capital*). The district court relied on *First Capital* to conclude that Laudermilch was required to "show that she has been aggrieved by [the IRS]" to have standing to object. 1-Laudermilch-8. But *First Capital* addressed a fundamentally different question—whether a class member had standing to appeal an attorney's fees award, not whether a class member may object to a settlement providing injunctive relief. *See First Capital*, 33 F.3d at 30; *see also Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1328 (9th Cir. 1999) ("We held in *First Capital* that a class member lacked standing to appeal an attorneys' fees award…"). When later cases use the word "object" in discussing *First Capital*, they do so only in the context of appeals of fee awards, *not* objections to the terms of a Rule 23(e) settlement. *See, e.g., Glasser v. Volkswagen of Am., Inc.*, 645 F.3d 1084, 1088 (9th Cir. 2011) (applying *First Capital* to establish "standing on appeal" for the class member who was injured by the fee award). The district court, therefore, applied the wrong legal standard.

Further, *First Capital* is inapposite because it does not govern a class member's standing to object to injunctive relief. Although some district courts

31

have repeated the same error, no appellate court has ever extended *First Capital* to a settlement objection. Of those district court decisions, all but one are unreported, and the one reported case, *Low v. Trump Univ., LLC*, quoted *First Capital* but ultimately denied standing solely on redressability, not injury, and did not apply *First Capital* to the objection itself. *See* 246 F. Supp. 3d 1295, 1305 (S.D. Cal. 2016).

Therefore, there is no legal basis to support the district court's conclusion that Laudermilch needed to show injury from the specific settlement provision she challenged to object. Rule 23(e) requires only that she be a class member. *See S.F. NAACP v. S.F. Unified Sch. Dist.*, 59 F. Supp. 2d 1021, 1033 (N.D. Cal. 1999) ("[N]onclass members have no standing to object to the settlement of a class action."); Fed. R. Civ. P. 23(e)(5)(A) ("Any class member may object to the proposal if it requires court approval under this subdivision (e).").

Even if *First Capital* were applicable here—which it is not—Laudermilch satisfied its standard. She has demonstrated multiple actual and imminent injuries that would be redressed by changes to the Injunctive Relief and is therefore an "aggrieved" class member even under the district court's erroneous test. *See First Capital*, 33 F.3d at 30.

**B.** **Laudermilch Suffered a Concrete and Particularized Injury Caused by the District Court's Approval of the Settlement and Implementation of the Injunctive Relief**

Laudermilch suffered a concrete injury as a direct result of the Injunctive Relief's roster limits provisions. 2-LaudermilchER-304–05, 429; 3-LaudermilchER-616–17. On October 31, 2025, at 4:00 p.m., when she attempted to commit to Liberty, the coach informed her that the school had just opted into the Settlement and would need to cut fifteen of the thirty-two women on the team. 3-LaudermilchER-475, 615. Liberty withdrew the roster spot it had previously offered her and increased the requirements for an athletic scholarship. 2-LaudermilchER-429; 3-LaudermilchER-475; *see Van v. LLR, Inc.*, 962 F.3d 1160, 1162 (9th Cir. 2020) ("[A] loss of even a small amount of money is ordinarily an injury," and " '[a]ny monetary loss suffered by the plaintiff satisfies the injury in fact element.' ") (cleaned up) (internal citations omitted). The Injunctive Relief harmed Laudermilch as well as her future teammates—several of whom were deterred from attending Liberty or quit the team altogether because the uncertainty was "more than they could handle." 2-LaudermilchER-304–05; *see Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 528–29 (N.D. Cal. 2017) (finding budget uncertainty sufficient for injury); *Langer v. Kiser*, 57 F.4th 1085, 1093 (9th Cir. 2023) (finding deterrent effects sufficient for standing in the ADA context). Laudermilch had already declined other Division I offers in reliance on the roster

spot that existed before Liberty decided to opt into the Settlement. 3-LaudermilchER-474–75, 615; *see Becker v. N.D. Univ. Sys.*, 112 F.4th 592, 595 (8th Cir. 2024) (finding "the continuing denial of an opportunity to compete for the team of their choice" was an injury in fact where the plaintiffs could have attended other schools but chose not to in reliance on being able to participate in a certain athletics program).

The loss of an opportunity to participate in Division I sports is a concrete injury, and the Injunctive Relief's roster limits directly caused that harm. 3-LaudermilchER-615; 2-LaudermilchER-304–05, 429. The consequences extend beyond the ability to compete—membership on a varsity team provides access to housing, academic support, medical care, training facilities, and coaching—benefits that disappear once a student-athlete loses her roster spot. 2-LaudermilchER-305.

### C. The Injunctive Relief's Roster Limits Cause Ongoing and Irreparable Harm to Current and Future Student-Athletes

The harm Laudermilch and her teammates experienced is not unique; the roster limits impose ongoing, irreparable harm upon thousands of current and future student-athletes. 2-LaudermilchER-304–05, 405–16, 429; 3-LaudermilchER-618–98. Although the Injunctive Relief Class includes both "Current" and "Incoming" members, Class Counsel limited objections to only "Incoming Injunctive Relief Class Members." 2-LaudermilchER-366–67. That

34

restriction creates a fundamental due process problem. "Current" class members—who may be cut weeks or months later—have no opportunity to object after the harm occurs. *See* 1-LaudermilchER-142–43. And "Incoming" student-athletes only become class members with standing to object if they make a Division I roster. 1-LaudermilchER-2; 2-LaudermilchER-311, 316, 366–67. A freshman who is recruited, arrives on campus, and is then cut during tryouts several weeks into a semester has no recourse—when notice was issued in late July, incoming Division I athletes had no way of knowing whether they would be harmed, but once a student-athlete is cut, they are no longer a class member eligible to object. *See* 2-LaudermilchER-380; *S.F. NAACP*, 59 F. Supp. 2d at 1032.

This structure excludes multiple categories of athletes directly affected by roster limits and deprives them of any meaningful opportunity to protect their interests, violating due process. Those excluded include:

- current student-athletes who are later cut when their teams reduce roster size to comply with the Settlement;

- student-athletes who suffer an injury or personal hardship that temporarily affects performance and makes them vulnerable to cuts;

- athletes who were verbally promised four-year roster opportunities but are later removed as teams recalibrated rosters under new limits;

- high-school recruits who planned their academic and athletic paths around pre-Settlement Division I standards, only to have those standards changed mid-recruitment; and

35

- aspiring athletes who will never reach Division I because reduced roster opportunities eliminate pathways that previously existed.

Nevertheless, these excluded student-athletes are bound by the Settlement and its forward-looking Injunctive Relief provisions. 1-LaudermilchER-134; 2-LaudermilchER-372–74.

Student-athletes' inability to object is not incidental; it reflects a structural exclusion from the approval process. Binding large segments of the class to harmful, future roster limits without giving them any meaningful opportunity to be heard violates both due process protections and Rule 23's adequacy and fairness requirements. *See* Fed. R. Civ. P. 23(e)(5)(A); *Officers for Just. v. Civ. Serv. Comm'n of City and Cnty. of S.F.*, 688 F.2d 615, 635 (9th Cir. 1982) (finding that class members' due process rights are protected by Rule 23's requirements for "approval…after notice to the class and a fairness hearing at which dissenters can voice their objections, and the availability of review on appeal"). The Settlement binds absent class members who had no voice in the process and now have no procedural avenue to protect their interests.

### D.     The District Court Failed to Redress the Ongoing Harm Caused by the Roster Limits Through a Grandfathering Provision

The Injunctive Relief Settlement's Designated Student-Athlete (DSA) provision was intended to protect student-athletes from losing athletic opportunities because of the roster limit requirement. 2-LaudermilchER-355–56.

36

Any athlete who would have lost a roster spot—or a promised roster spot—for the 2025-26 academic year due to the implementation of roster limits is exempt from counting as a roster spot at any Division I institution for the duration of their collegiate career eligibility. 2-LaudermilchER-356–57. Therefore, DSAs were not supposed to be adversely affected by roster limits for the remainder of their eligibility.

However, in practice, the DSA mechanism fails to function as a meaningful safeguard. 2-LaudermilchER-230–32. It depends on institutional discretion, applied only to the 2025-26 roster cycle, and offers no protection to current or incoming athletes facing roster cuts under the Settlement's ongoing roster limit requirements. A simple grandfathering provision—preserving existing roster commitments for current and incoming athletes—would prevent the immediate and foreseeable harm that occurred. 3-LaudermilchER-462–63, 499, 540. The district court had the authority to require such a provision as a condition of approval, but declined to do so, instead leaving thousands of student-athletes exposed to the roster cuts the Injunctive Relief created.

Universities are reducing team sizes across multiple sports to comply with the roster limit provisions. 3-LaudermilchER-468–73. Those reductions, in turn, require institutions to recalculate their Title IX compliance. The intended protection offered by the DSA designation is undermined by the Settlement's

37

failure to account for how the roster limits interact with Title IX's gender equity requirements. The DSA mechanism cannot protect athletes when entire teams are being downsized or rebalanced to satisfy both the Settlement and Title IX, leaving student-athletes exposed to the very harms the Injunctive Relief was supposed to prevent. 2-LaudermilchER-306–07.

The district court, Class Counsel, and Defendants declined to address the Settlement's Title IX implications, even though Title IX compliance predictably limits, and in some cases nullifies, the effectiveness of the DSA mechanism. *See generally* 1-LaudermilchER-2–11. Class Counsel now asserts that roster cuts are merely "what competition is about," not consequences of the Settlement. 2-LaudermilchER-223. That position is internally inconsistent. When institutions make favorable changes, Class Counsel attributes those outcomes to the Settlement; when institutions make adverse changes compelled by the Settlement's roster limit constraints, Class Counsel disclaims responsibility. 2-LaudermilchER-232. This asymmetry underscores the inadequacy of representation and the failure to account for foreseeable, real-world harms created by the Injunctive Relief. 2-LaudermilchER-233.

**II.** **The District Court Abused Its Discretion by Approving the Settlement and Continuing Injunctive Relief That Are Not Fair, Reasonable, or Adequate**

Rule 23(e) requires that any class action settlement be "fair, reasonable, and adequate" to protect the interests of absent class members. The Supreme Court has emphasized that absent class members are entitled to meaningful protection and may be bound only if they are adequately represented. *See Hansberry v. Lee*, 311 U.S. 32, 42–43 (1940). When class members' interests diverge, due process demands structural safeguards—separate representation, separate negotiations, and heightened judicial scrutiny. *See Amchem*, 521 U.S. at 625–27; *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 852–53 (1999). The Supreme Court has also made clear that unnamed class members must retain the ability to challenge a settlement when their interests are not protected. *See Devlin v. Scardelletti*, 536 U.S. 1, 14 (2002).

The district court certified two materially different classes: (1) a Damages Class, and (2) an Injunctive Relief Class. 1-LaudermilchER-134. Despite the divergent interests, the court appointed a single set of Class Counsel, Winston & Strawn LLP and Hagens Berman Sobol Shapiro LLP (collectively Class Counsel), to represent both. 1-LaudermilchER-114; 4-LaudermilchER-787–88. This structure created the precise conflict the Supreme Court and Ninth Circuit have warned against.

39

A. **The Settlement Creates an Intra-Class Conflict: The Damages Class Seeks Backward-Looking Monetary Relief While the Injunctive Relief Class Has Forward-Looking Interests**

The Injunctive Relief Class includes: "All student-athletes who compete on, competed on, or will compete on Division I athletic team at any time between June 20, 2020, through the end of the Injunctive Relief Settlement Term." 1-LaudermilchER-111–12. Because that term extends ten academic years from Final Approval of the Settlement, the class encompasses all Division I athletes from June 20, 2020, through June 6, 2035. 1-LaudermilchER-112. Accordingly, the Injunctive Relief Class includes all current and future Division I student-athletes over the next decade. Its members face ongoing, forward-looking regulatory burdens, including roster limits, DSA classifications, and structural changes required to fund $20.5 million in annual revenue-sharing payments by member institutions. 1-LaudermilchER-137–39. These burdens directly reduce participation opportunities by forcing roster cuts, diverting funding away from women's and Olympic sports, and materially impairing a university's ability to comply with Title IX. 2-LaudermilchER-240–69, 272–94, 301–08.

These forward-looking interests differ fundamentally from those of the Damages Class, which is composed of former student-athletes seeking monetary compensation for the NCAA's past use of their NIL. The Damages Class is allocated $2.6 billion in Settlement funds and faces no ongoing regulatory burdens.

40

4-LaudermilchER-748. Its interests are entirely backward-looking and monetary. The two classes do not share uniform interests, and their incentives diverge sharply:

- The Damages Class benefits from securing a $2.6 billion payout.

- The Injunctive Relief Class must live with roster limits, reduced participation opportunities, and financial pressures through 2035 as a result of the monetary damages payout.

The Damages Class, which consists substantially of former student-athletes no longer impacted by changes to the recruitment and participation structures, has every incentive to accept restrictive injunctive relief terms since doing so preserves the monetary Settlement. The Injunctive Relief Class, by contrast, bears the full cost of those restrictions. This is the precise structural conflict that *Amchem* and *Ortiz* held could not be cured by appointing a single set of counsel to represent materially adverse groups. *Amchem*, 521 U.S. at 627 (finding that class action settlements must provide "structural assurance of fair and adequate representation for the diverse groups and individuals affected"); *Ortiz*, 527 U.S. at 856 ("[I]t is obvious after *Amchem* that a class divided between holders of present and future claims . . . requires division into homogeneous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel.").

The Ninth Circuit has likewise held that conflicts of interest within a class— whether through divergent allocations of benefits or structural differences between

41

subgroups—impair adequate representation and require heightened scrutiny. *See In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., and Prods. Liab. Litig.*, 895 F.3d 597, 607–08 (9th Cir. 2018). The Ninth Circuit has reaffirmed that Rule 23(a)(4) demands the absence of conflicts between named plaintiffs, class counsel, and absent class members. *See Kim v. Allison*, 87 F.4th 994, 1000–03 (9th Cir. 2023).

By approving a Settlement negotiated without separate representation, without structural protections, and despite clear intra-class conflicts, the district court failed to ensure the Injunctive Relief was "fair, reasonable, or adequate" under Rule 23(e). The Injunctive Relief Class—particularly future student-athletes who received no notice of the Settlement, had no opportunity to opt out, yet were bound by its releases—was not adequately represented, in violation of due process.

**B.     The Injunctive Relief Class Was Not Adequately Represented in Violation of Rule 23(a)(4)**

Rule 23(a)(4) requires the representative parties to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This inquiry asks whether the representatives (1) have any conflicts of interest with other class members and (2) will prosecute the action vigorously on behalf of the class. *See Stanton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). Rule 23(g)(2) imposes the same duty on class counsel, permitting appointment only if counsel "will fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4).

42

Here, the Injunctive Relief Class was not adequately represented by either Class Counsel or the Class Representatives. As shown above, the Injunctive Relief Class and Damages Class have materially divergent interests—yet the district court appointed a single set of Class Counsel to represent both groups despite the structural conflicts. 1-LaudermilchER-114.

### 1. Class Counsel Failed to Protect the Interests of the Injunctive Relief Class

Adequate representation under Rule 23(a)(4) turns on whether all materially distinct interests within the class were fairly and adequately represented, not on the general competence of counsel. 1-LaudermilchER-196–202; *1988 Tr. for Allen Child. v. Banner Life Ins. Co.*, 28 F.4th 513, 524 (4th Cir. 2022) ("[C]lass counsel's competency is merely necessary, not sufficient, for Rule 23(a)(4) adequacy."). When class members' interests diverge, due process requires separate representation. *See Amchem*, 521 U.S. at 625–27; *Ortiz*, 527 U.S. at 852–53; *Hansberry*, 311 U.S. at 42–43.

Class Counsel did not adequately represent the Injunctive Relief Class. 2-LaudermilchER-243–45, 289, 405–10, 416, 430. No named representative shared the interests of student-athletes harmed by roster limits, discretionary DSA designations, or Title IX-related roster compression. 2-LaudermilchER-216–18, 232, 279–80, 304–05. No one advocated for athletes whose primary concern was participation, not monetary recovery. And future student-athletes through 2035—

43

those who will experience the greatest harm—had only a brief opportunity to object as "incoming" class members, a 60-day window that closed long before the injunctive terms would affect their four years of eligibility. 2-LaudermilchER-355–57. Despite this, Class Counsel limited their advocacy to class members who supported approval of the Settlement, leaving non-paid, non-elite student-athletes—those most burdened by the injunctive relief terms—without meaningful representation. 2-LaudermilchER-232, 308.

The district court's treatment of Appellant's objection underscores this failure. Laudermilch did not seek personal representation by Class Counsel. 1-LaudermilchER-5. She emailed Class Counsel and the same letter she had already submitted to the district court, explaining that "she was a high school senior whose future collegiate athletic career plans have been turned upside down due to the roster limits" and that she was "willing to help this case any way possible." 2-LaudermilchER-308. By treating her communication as a request for individual representation, the district court made a clearly erroneous factual finding and, as a result, failed to consider evidence directly relevant to the Rule 23(a)(4) adequacy inquiry—whether the class structure itself protected all materially distinct interests. 1-LaudermilchER-5.

44

This error is especially significant in light of what the Notices told student-athletes about who represented them. The first Class Action Notice stated, under the heading, "**Do I have a lawyer in this lawsuit?**":

> "In a class action, the court appoints class representatives and lawyers to work on the case and represent the interests of *all class members*. For this settlement, the Court has appointed the following individuals and lawyers.
>
> **Your Lawyers:** Steven Berman of Hagens Berman Sobol Shapiro LLP and Jeffrey Kessler of Winston & Strawn LLP. These are the lawyers who negotiated this settlement on *your behalf.*
>
> If you want to be represented by your own lawyer, you may hire one at your own expense."

3-LaudermilchER-723–24.

Likewise, the Notice of Your Right to Object to the Injunctive Relief informed prospective student-athletes that the court had appointed Class Counsel "to represent the interests of *all* class members," again identifying Mr. Berman and Mr. Kessler as "the lawyers that negotiated the settlement on *your behalf.*" 2-LaudermilchER-316 (emphasis added).

A reasonable incoming student-athlete would understand from these Notices that Class Counsel represented *all* class members for purposes of the Settlement. Following those instructions, Laudermilch emailed her objection letter to Class Counsel (Mr. Kessler) on February 1, 2025—the same letter she had already filed

45

with the district court. 2-LaudermilchER-301–02. Winston & Strawn partner Adam Dale, copying Mr. Kessler, responded: "*We are the lawyers representing the athletes who are asking the judge to approve the settlement.*" 2-LaudermilchER-308 (emphasis added). This statement is significant not because Appellant sought individual representation—she did not, as she was already a class member—but because it confirmed that Class Counsel viewed their role as representing *only* those class members who supported approval, not the class as a whole. 2-LaudermilchER-302, 308; 3-LaudermilchER-615–17.

This admission exposes the structural conflict and undoubtedly demonstrates that the Incoming Injunctive Relief Class had no meaningful representation during Settlement negotiations. Where no named representative shared the interests of non-paid Injunctive Relief Class members, and Class Counsel expressly disclaimed representing dissenting or adversely affected members, student-athletes lacked meaningful representation during negotiation and approval of the Settlement. Rule 23(a)(4) requires more than competent negotiation for one group—it requires representation aligned with *all* materially distinct class interests. *See Amchem*, 521 U.S. at 627; *Ortiz*, 527 U.S. at 856; *In re Volkswagen "Clean Diesel"*, 895 F.3d at 607 n.13 ("Where a conflict of interest exists within a class . . . additional due process safeguards—such as creating subclasses for groups with disparate interests

46

and appointing separate counsel to represent the interests of each—may be required.").

The district court's reliance on its prior finding that Class Counsel acted as "excellent representatives" in negotiating the Settlement misses the point. 1-LaudermilchER-5. The question is not about the quality of advocacy for the Damages Class or for athletes seeking approval; it is about the total absence of advocacy for a large, identifiable subgroup whose interests were neither represented by named plaintiffs nor advanced by Class Counsel at any stage of the negotiations. *See Amchem*, 521 U.S. at 627–29; *Ortiz*, 527 U.S. at 856; *In re Volkswagen "Clean Diesel"*, 895 F.3d at 607; *Kim*, 87 F.4th at 1000–02.

### 2. Class Representatives Failed to Protect the Interests of the Injunctive Relief Class

Rule 23(a)(4) requires class representatives whose interests align with those of the class. The Ninth Circuit has repeatedly held that representation is inadequate where representatives come from a narrow, atypical subgroup whose incentives diverge from those of the majority. *In re Volkswagen "Clean Diesel"*, 895 F.3d at 607–08; *Kim*, 87 F.4th at 1003.

The Class Representatives for the Injunctive Relief Class—Grant House, DeWayne Carter, Nya Harrison, Sedona Prince, and Nicolas Solomon—did not share the interests of student-athletes who will actually live in the world created by the Injunctive Relief. 1-LaudermilchER-112. None are current student-athletes

47

subject to roster limits, discretionary DSA designations, or reduced funding for non-revenue generating sports. Each had already exhausted eligibility, graduated, and moved on to professional careers before the Settlement was finalized. They faced no risk of being cut, losing a scholarship, or having their collegiate experience altered by a new revenue-sharing system. Their interests diverged sharply from those of current and future class members whose student-athlete experience depends on roster stability and a full four-year trajectory.

This inadequacy of representation is confirmed by Class Representative Grant House's own statements. In a July 2, 2025, *SportsWise* podcast interview, House admitted that his "involvement in the settlement was zero," that "the compromises, the negotiation, the talks. . .were without me or without any athletes present," and that, "one of the most unfortunate things was people were losing roster spots." 2-LaudermilchER-302; SPORTSWISE, *Ep. 89: The Final House v. NCAA Podcast (For Now) With...Grant House!*, at 15:48 (July 2, 2025), https://www.sportswisepod.com/ep-89-the-final-house-vs-ncaa-podcast-for-now-withgrant-house/. These admissions contradict his sworn declaration asserting regular consultation with Class Counsel and demonstrate that the named representatives were neither meaningfully involved in the process nor positioned to safeguard the interests of the student-athletes most affected by the Injunctive Relief. 1-LaudermilchER-6.

48

General communication about case status is not the same as meaningful participation in negotiations. Rule 23(a) requires more than passive awareness; it requires that the class representative be able and willing to protect the interests of the class during the most consequential phase of litigation. Fed. R. Civ. P. 23(a)(4) ("One or more members of a class may sue or be sued as representative parties on behalf of all members only if . . . the representative parties will fairly and adequately protect the interests of the class.").

The district court's assertion that Grant House's podcast statements "are not in the record" is procedural, not substantive. 1-LaudermilchER-6. Evidence does not become irrelevant simply because it originated outside formal filings. Courts routinely consider extrinsic statements by class representatives—including interviews and public remarks—when assessing adequacy of representation under Rule 23(a)(4), particularly where those statements bear directly on the representative's knowledge, involvement, or alignment with the class's interests. *See In re FleetBoston Fin. Corp. Sec. Litig.*, 253 F.R.D. 315, 329 (D.N.J. 2008) ("In determining adequacy of representation, a district court is not confined to specific procedures, and it is proper for the district court to consider all available additional circumstances and facts of a case.") (citing *Schy v. Susquehanna Corp.*, 419 F.2d 1112, 1116 (7th Cir. 1970) ("In determining the adequacy of

49

representation, the district court is not confined to the specific procedure outlined by [R]ule 23.")))

House's statements are offered not for background commentary, but as an admission by a named plaintiff concerning his lack of participation in settlement negotiations and his disagreement with material outcomes of the Settlement. 2-LaudermilchER-302–03. His statements are further corroborated by Appellant's interaction with another named representative, Sedona Prince, at the April 7, 2025, final approval hearing. Prince told Laudermilch that she commended her for objecting and that she did not support the roster cuts. 2-LaudermilchER-306. Together, these statements confirm that the class representatives were not aligned with, and did not adequately represent, the student-athletes most affected by the Injunctive Relief.

Rather than correcting this imbalance, Class Counsel reinforced it. On October 31, 2025, after objections raised concerns about inadequate representation, they added another elite athlete, Miller Moss, a fifth-year, highly compensated transfer quarterback preparing for the NFL. 2-LaudermilchER-236–39. Moss is not typical of the Injunctive Relief Class. He is not affected by roster limits, he is being paid to play an extra year at Louisville, and he does not share the interests of non-elite athletes whose participation opportunities are threatened. *See* Deepak Joshi, *Miller Moss' Confirmed Louisville NIL Turns QB Lincoln Riley Break-Up on Its*

50

*Head*, ESSENTIALLY SPORTS (Aug. 8, 2025). Adding another elite, high-profile football player only widened the representation gap. The student-athletes most vulnerable to roster limits, current and future non-elite athletes, remained unrepresented. 2-LaudermilchER-308.

Rule 23 does not permit a class to be certified where representatives come from a narrow, atypical subgroup whose incentives and risks differ from the majority. *See Amchem*, 521 U.S. at 607–08, 623; *In re Online DVD*, 779 F.3d at 942 (stating that a court abuses its discretion by certifying a class where there exists a fundamental conflict between class representatives and absent class members that goes to the specific issues in controversy). Yet the Injunctive Relief Class—comprising all current and future Division I athletes—is represented almost entirely by elite, highly compensated athletes with secure roster status and substantial NIL opportunities. 2-LaudermilchER-305–06. The student-athletes most vulnerable to roster limits and reduced participation opportunities had no representative who shared their risks or perspectives.

The divide is even more pronounced between former and current athletes. Former athletes, whose eligibility has expired, do not share the same interest in preserving roster spots or maintaining educational and developmental opportunities. 2-LaudermilchER-216–18, 306. The Settlement's roster limits primarily harm those still competing or aspiring to compete. That divergence

51

underscores why the named representative—none of whom will live under the Injunctive Relief—were not aligned with the interests of the Injunctive Relief Class and could not adequately represent them. Having already graduated, secured professional opportunities, and insulated from any risk of roster limits, these Class Representatives had nothing to lose and everything to gain from the Settlement. *See* 2-LaudermilchER-230. This structural conflict renders them inadequate to represent the whole class, and the district court's failure to recognize and correct this inadequacy was an abuse of discretion.

**C. The Settlement and Injunctive Relief Violate Due Process by Failing to Give Adequate Notice to Future Class Members and Denying Them an Opportunity to Opt Out**

The Fifth and Fourteenth Amendments guarantee that no person shall be deprived of "life, liberty, or property, without due process of law." U.S. Const. amends. V, XIV. These are guarantees of fundamental fairness required in every judicial proceeding, including the approval of a class action settlement. *See* Fed. R. Civ. P. 23(e)(1)(B); *In re Online DVD*, 779 F.3d at 944. Class actions present unique due process problems for absent class members, requiring higher judicial scrutiny to ensure that the settlement is fair to all affected. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

Due process requires that absent class members receive notice that is "reasonably calculated, under all the circumstances, to apprise interested parties of

52

the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). Due process necessarily "include[s] an opportunity to be excluded from the action." *Hanlon*, 150 F.3d at 1024. Not only do the future student-athletes who will become members of the class have no opt-out opportunity until after the harm has occurred, but there is no way for the court or attorneys to identify who the incoming class members will be. This highlights the structural due process deficiencies created by the Settlement, which could have been avoided had the objectors been able to participate in the Settlement negotiations or the court ensured all members of the class were being adequately represented.

### 1. Notice Was Constitutionally Inadequate

The notice must "convey the required information" and "afford a reasonable time for those interested to make their appearance." *Mullane*, 339 U.S. at 314. The district court's conclusion that the notice program satisfied Rule 23 and due process rests on an unduly narrow conception of who qualifies as an "interested party" and when notice must be meaningful. While it may be impracticable to identify every future Division I athlete by name, Rule 23 does not permit a notice scheme that is functionally delayed until after the settlement's consequences have already taken effect and reshaped the opportunities for large segments of the class. *See id*.

The Injunctive Relief Settlement Class expressly includes future Division I athletes for the next ten years. 3-LaudermilchER-716. Yet the notice program provides no communication to those individuals—or their families—until the moment of enrollment. 3-LaudermilchER-549. By that time, the Settlement's Injunctive Relief provisions, including roster limits, will have already altered participation opportunities, recruiting pathways, and developmental trajectories. Many future class members are harmed by the Settlement because they will never reach Division I athletics at all, and therefore never receive any notice or an opportunity to object. *See* 3-LaudermilchER-516–19. A notice program that reaches only those who survive the harm done by the Settlement cannot be deemed "reasonably calculated" to inform all interested parties, as due process requires. *See Mullane*, 339 U.S. at 314; *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985).

The district court's reliance on the fact that Appellant received notice on July 23, 2025, does not cure this defect. Notice delivered at enrollment does not provide a meaningful opportunity to object to a Settlement that altered the conditions under which class members trained, planned, and pursued collegiate athletics years earlier. Rule 23 protects absent class members *before* their rights and expectations are compromised, not merely after the consequences have already gone into effect. *See Shutts*, 472 U.S. 797, 812 (1985). Despite the difficulty in

54

ascertaining who may become a DI athlete, this method of notice is "substantially less likely to bring home notice" than another feasible alternative, such as informing students when they sign up for the recruitment portals, making it inadequate. *See Mullane*, 339 U.S. at 315.

Moreover, the district court assumes that notice is sufficient so long as it is delivered to incoming student-athletes annually. 2-LaudermilchER-319–29. That assumption ignores the reality of the Injunctive Relief Class: at the time of approval, many class members were still in high school and received no communication from the NCAA about the Settlement, despite regularly receiving other NCAA communications through the Eligibility Center. As Appellant's experience illustrates, she learned of her right to object not through the Court-approved notice program, but from a private sports podcast. 2-LaudermilchER-303–04. A notice program that is misunderstood at best and undiscoverable at worst does not satisfy Rule 23 or due process. *See Shutts*, 472 U.S. at 812.

Finally, while the district court emphasized the practical challenge of reaching future student-athletes, those challenges do not excuse a notice scheme that ignores the Settlement's forward-looking reach. 1-LaudermilchER-7. The absence of meaningful notice to prospective student-athletes and their parents—who are actively making long-term educational, financial, and athletic decisions—shows that the notice program failed to account for the realities of the class and did

55

not meet due process standards for informing those whose rights were directly affected. 3-LaudermilchER-517–18. Because the notice program failed to inform the very class members most affected by the Injunctive Relief and provided no ability to opt out of the releases that bind them, the district court's approval of the notice program was an abuse of discretion. *See Hansberry*, 311 U.S. at 40; *Shutts*, 472 U.S. at 812. A notice program that leaves future class members unaware of their rights until after those rights have been compromised cannot be deemed fair, reasonable, or adequate under Rule 23 or the Constitution.

### 2. The Settlement and Injunctive Relief Improperly Bind Future Class Members With No Ability to Opt Out

The Injunctive Relief Class violates due process because it binds future student-athletes—individuals not yet identified, enrolled, or even recruited—without providing them notice or an opportunity to opt out of the releases that extinguish their rights. 2-LaudermilchER-315, 366–67, 372–73, 380–83. The U.S. Supreme Court requires notice "reasonably calculated" to reach all interested parties *before* their rights are affected. *See Mullane*, 339 U.S. at 314. The Settlement and Injunctive Relief bind an entire decade of future Division I student-athletes who, by definition, received no notice at all.

The general rule is that an individual cannot be bound by the judgment of *in personam* litigation to which they are not a party as a basic principle of due process. *See Hansberry*, 311 U.S. at 40. Any claim of an exception to this rule

56

must be proven by the party trying to bind nonparties. *See Ortiz*, 527 U.S. at 846. Here, Class Counsel has not adequately proven that an exception applies because these absent, future class members' interests have not been adequately represented in the litigation. *See id*; 3-LaudermilchER-516–17, 549. At a minimum, due process requires that an absent class member be provided an opportunity to opt out. *See Shutts*, 472 U.S. at 812. The district court approved a Settlement that does not even afford that basic guarantee to thousands of future class members, who are also being asked to release Title IX antidiscrimination claims. 2-LaudermilchER-372–74.

Future class members are uniquely vulnerable to the Settlement's Injunctive Relief terms. Roster limits, participation reductions, and altered recruiting pathways shape whether an athlete ever reaches Division I athletics. Many will be harmed precisely because they never were recruited or placed on a roster—and therefore never received an opportunity to object. *See* 3-LaudermilchER-468–72. A class action cannot bind individuals whose rights are affected before they are even identifiable, much less informed. The due process rights of class members "include an opportunity to be excluded from the action." *Hanlon*, 150 F.3d at 1024. It is "unfair[]" to bind these future class members "who might be unaware of the class action or lack sufficient information about [their harm] to make a reasoned decision whether to stay in or opt out." *Amchem*, 521 U.S. at 611.

Rule 23 also does not permit binding future class members to broad releases without an opportunity to opt out. *Devlin* makes clear that absent class members whose rights are extinguished must have a meaningful opportunity to protect their interests. *See Devlin*, 536 U.S. at 7, 11, 14. Here, future student-athletes had none. They were not notified, could not object, and were denied the ability to opt out of a Settlement that reshapes their athletic and educational opportunities.

By binding future student-athletes who never received notice, never consented, and never had the ability to opt out, the Settlement violates the basic requirements of due process. *See Mullane*, 339 U.S. at 314; *Hanlon*, 150 F.3d at 1024. The district court's approval of such a structure was an error and constitutes an abuse of discretion.

### 3. Pro Se Objectors Were Excluded from the Amendment Process Redressing Roster Limits

Exclusion of the two pro se objectors who specifically challenged roster limits at the final approval hearing—Gracelyn Laudermilch and Gannon Flynn—from the amendment process further underscores the Settlement's procedural defects. 3-LaudermilchER-468–77. After directing the parties to address concerns raised at the fairness hearing, the district court permitted only attorneys to

participate in the negotiations that produced the amended Settlement Agreement.[1] 2-LaudermilchER-400–04. Laudermilch and Flynn, the very individuals whose objections prompted the court's intervention and who faced the most direct harm from roster cuts, were barred from the discussions entirely. 2-LaudermilchER-404.

Due process does not allow a court to solicit objections, acknowledge their legitimacy, and then exclude those objectors from the only process designed to remedy the harm they identified. *See Devlin*, 536 U.S. at 14 (holding that fairness under class action procedures requires allowing absent class members to object at the fairness hearing, appeal the settlement, and appeal the district court's disregard of their objection). By allowing only represented parties to participate—and by shutting out the pro se objectors whose interests were uniquely at stake—the district court deprived them of a meaningful opportunity to be heard. This exclusion was not just unfair, it was an abuse of discretion that undermined the legitimacy of the amended Settlement that was ultimately approved.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court should be vacated. Because the Injunctive Relief was approved and continued despite a

---

[1] The district court requested Laura Reathaford, Steven F. Molo, and the Buchalter firm—counsel for objectors—consult remotely with the parties' counsel to address concerns regarding the implementation of roster limits.

59

structural conflict and inadequate representation, the case should be remanded with instructions to appoint new counsel.

Date: April 6, 2026

*/s/ Gracelyn Lee Laudermilch*
209 Crawford Lane
Rome, PA 18837
(570) 637-4508
gllaudermilch@gmail.com

*Pro Se Objector-Appellant:* Gracelyn Lee Laudermilch

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)**  25-7461, 25-7467, 25-7469, 25-7824, 25-7869

I am the attorney or self-represented party.

**This brief contains 12,951 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).
I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  s/ Gracelyn Lee Laudermilch   **Date** April 6, 2026

1

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 15. Certificate of Service for Electronic Filing**

**9th Cir. Case Number(s)**  25-7461, 25-7467, 25-7469, 25-7824, 25-7869

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[   ] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**
[   ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Opening Brief: Gracelyn Lee Laudermilch (Pro Se Objector-Appellant)

Excerpts of Record – Index Volume, Volumes I–V

**Signature**  s/ Gracelyn Lee Laudermilch    **Date** April 6, 2026